UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                         Case No. 23-cr-324 (NEB/LIB)

                Plaintiff,

                                       **ORDER AND**
v.                                                **REPORT AND RECOMMENDATION**

Donald Duane Armstrong, Jr (1)
Franklin Warren Sam, Jr (2),

                Defendants.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon the parties' various pre-trial Motions, [Docket Nos. 17, 18, 32, 33, 34, 35, 39, 42, 43, 44, 45, 46, 48, 49], upon Defendant Donald Duane Armstrong, Jr.'s ("Defendant Armstrong") Motion to Dismiss Indictment, [Docket No. 36], Motion to Suppress Statements, Admissions, and Answers, [Docket No. 37], Motion to Suppress Evidence Obtained by Search and Seizure, [Docket No. 38], and upon Defendant Franklin Warren Sam, Jr.'s ("Defendant Sam") Motion to Dismiss Indictment, [Docket No. 41], and Motion to Sever. [Docket No. 47]. The Court held a Motions hearing on January 9, 2024, regarding the parties' pretrial motions.

For the reasons discussed herein, the Government's Motion for Discovery as to Donald Duane Armstrong, Jr., [Docket No. 17]; Government's Motion for Discovery as to Franklin Warren Sam, Jr., [Docket No. 18]; Defendant Armstrong's Motion for Disclosure of 404(b) Evidence, [Docket No. 32]; Defendant Armstrong's Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 33]; Defendant Armstrong's Motion to Retain Rough Notes, [Docket No. 39]; Defendant Sam's Motion for Disclosure of 404(b) Evidence, [Docket No.

46]; and Defendant Sam's Motion to Retain Rough Notes, [Docket No. 49], are **GRANTED**.  In addition, Defendant Armstrong's Motion for Discovery, [Docket No. 34]; Defendant Sam's Motion for Disclosure of the Identity of Informants, [Docket No. 44]; Defendant Sam's Motion for Disclosure of the Post-Conspiracy Statements of Co-Defendants or Unindicted Co-Conspirators, [Docket No. 45]; and Defendant Sam's Motion for Discovery, [Docket No. 48], are **GRANTED** in part and **DENIED** in part.

However, Defendant Armstrong's Motion for Disclosure of Jencks Act Material, [Docket No. 35]; Defendant Sam's Motion for Disclosure of Jencks Act Material, [Docket No. 42]; and Defendant Sam's Motion for Disclosure of Grand Jury Materials, [Docket No. 43], are **DENIED**.

Further, it is recommended that Defendant Armstrong's Motion to Dismiss Indictment, [Docket No. 36]; Motion to Suppress Statements, Admissions, and Answers, [Docket No. 37]; Defendant Sam's Motion to Dismiss Indictment, [Docket No. 41]; and Defendant Sam's Motion to Sever, [Docket No. 47], be **DENIED**. In addition, the undersigned recommends that Defendant Armstrong's Motion to Suppress Evidence Obtained by Search and Seizure, [Docket No. 38], be **GRANTED** in part and **DENIED** in part.

## I.    Background

Defendant Armstrong and Defendant Sam are charged with conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 922(a)(6) by making false statements in the purchase of a firearm. (Indictment [Docket No. 1]). The indictment alleges that Defendant Sam purchased a firearm and completed ATF Form 4473 certifying that he was the actual transferee/buyer of the firearm when, in fact, he was purchasing the firearm on behalf of Defendant Armstrong. Defendant Sam is also charged with eight (8) counts of making false statements in the purchase of a firearm in violation

of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). (Id.). Defendant Armstrong is also charged with a single count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8). (Id.)

## II.    Government's Motions for Discovery. [Docket Nos. 17, 18].

The Government seeks discovery pursuant to Rules 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure as to both Defendants. (See Gov't's Mots. for Discovery [Docket Nos. 17, 18]).

### A.    Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendants, if either intends to claim alibi as a defense, to state the specific place or places at which Defendants claim to have been at the time of the alleged offenses in the above-captioned matter and the names and addresses of the witnesses upon whom Defendants intend to rely to establish such alibi. (See Gov't's Mots. for Discovery [Docket Nos. 17, 18]).

Neither Defendant has objected to the Government's request. The motion is **GRANTED**, and Defendants shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### B.    Notice of Insanity/Mental Illness Defense

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendants, if they intend to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendants relevant to the issue of guilt, to provide the Government notice of such defense.

Neither Defendant objected to this request. The motion is **GRANTED**, and Defendants shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### C.    Notice of Public Authority

Pursuant to Federal Rule of Criminal Procedure 12.3, the Government seeks an order from the Court requiring Defendants, if either intends to rely upon the defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the offense, to notify the Government and the Court no later than the date of the first hearing on pretrial motions.

Neither Defendant objected to this request.  The motion is **GRANTED**, and Defendants shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### D.  Witness Statements

The Government seeks all written statements within either Defendant's possession or control of any witness that Defendants intend to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Neither Defendant objected to this request.  The motion is **GRANTED**.  To the extent either Defendant has statements in his possession or control by any witness that they intend to call to testify in connection with a suppression hearing, detention hearing, trial, or sentencing, Defendants shall disclose such statements to the Government no later than three (3) calendar days before such witness is called to testify.

### III.    Defendants' Pretrial Motions for Disclosure of 404(b) Evidence.  [Docket Nos. 32, 46].

Defendants seek immediate disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (See Def. Armsrong's Pretrial Mot. for Disclosure of 404 Evidence [Docket No. 32]; see also Def. Sam's Pretrial Mot. for Disclosure of 404(b) Evidence [Docket No. 46]).

4

In its written responses, the Government acknowledged its obligation to comply with Rule 404(b), and it represented that it will continue to comply with its obligations. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at pp. 1-2; Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 8). The Government suggested that disclosures regarding Rule 404(b) evidence be made no later than twenty-eight (28) days before trial. (Id.).

In the relevant part, Rule 404(b)(3) states that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant Armstrong's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 32], and Defendant Sam's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 46], are **GRANTED**. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than twenty-eight (28) days before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[1]

## IV.  Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant.  [Docket No. 33].

Defendant Armstrong seeks disclosure of evidence favorable to him which would fall within the authority of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and their progeny. (Def.'s Pretrial Mot. to Compel Disclosure of Evidence Favorable

---

[1] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. <u>United States v. Adediran</u>, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); <u>see</u> <u>United States v. Williams</u>, 900 F.2d 823 (5th Cir. 1990).

to the Defendant [Docket No. 33]).  Defendant specifically seeks any statements of any witnesses exculpating him, along with any related reports of interviews of these witnesses; or any statements of witnesses, which contradict statements of other witnesses, along with any related reports of interviews of these witnesses; any prior conviction of prospective Government witnesses; any statements of any witness that the firearm identified in Count 1 of the Indictment was in the possession or control of someone other than Defendant; any identification of persons other than the Defendant by eyewitnesses to the crime; any failure to identify Defendant by any eyewitnesses to the crime; and any offers or promises made to prospective government witnesses to induce their cooperation against Defendant whether or not the Government intends to call those persons as witnesses.  (Id.).  Defendant also seeks any evidence that the firearms described in Count 10 of the Indictment were in the possession or control of someone other than Defendant; any fingerprints, handwriting, DNA, or other scientific evidence which was not identified with Defendant; and "any items seized from parties other than the defendant which tend to identify them rather than the defendant with [sic] commission of the crimes charged in the indictment."  (Id.).

The Government, acknowledging its duty to disclose responsive materials and information, represented that it has previously disclosed evidence favorable to the Defendant within its possession and will continue to comply with its obligations under Brady, and its progeny.  (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at pp. 2-3).  Regarding the Defendant's specific requests, the Government represents that to the extent such information exists, it either has been disclosed or will be immediately disclosed once received. (Id.). However, the Government objects to Defendant's  requests for Giglio materials to the extent that it requests information regarding individuals whom the Government does not intend to call as trial witnesses. (Id.).

Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 33], is **GRANTED** in part and **DENIED** in part. The Government will disclose any and all remaining and/or subsequently discovered, obtained, or obtainable material responsive to <u>Brady</u> to the Defense as soon as said responsive materials are discovered by the Government.[2] As for materials which are responsive to <u>Giglio</u> and related to the impeachment of the Government's witnesses to be called at trial, the Government will disclose materials no later than seven (7) days before (a) trial or (b) when the presiding trial judge requires disclosure of the Government's witness list, whichever is earlier.[3] To the extent the relief sought in Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 33], was not expressly granted herein, it is denied.

## V.    Defendants' Motions for Discovery. [Docket Nos. 34, 48]

Defendants Armstrong and Sam move the Court to order the Government to disclose and make available for inspection, copying, and photographing, the following information.

### A.  Armstrong's motions for discovery

Defendant Armstrong makes multiple requests pursuant to Federal Rule of Criminal Procedure 16(a). (Armstrong's Mot. for Discovery [Docket No. 34]). Specifically, Armstrong's requests encompass statements of the defendant, documents and tangible objects, reports of examinations and tests, expert witnesses, and the criminal record of Armstrong. (<u>Id.</u>).

---

[2] The Court notes that, in <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under <u>Brady</u>." <u>United States v. Garrett</u>, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the <u>Brady</u> rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." <u>United States v. Clark</u>, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose <u>Brady</u> material, it acts at its own peril." <u>Id.</u> Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its <u>Brady</u> obligations.

[3] The Government's disclosure of materials responsive to <u>Giglio</u> and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.

### 1. Statements of the Defendant

Defendant requests pursuant to Federal Rule of Criminal Procedure 16(a) that the Court order the Government to provide Defendant with any written or recorded statements made by the defendant as well as any written record containing a reference to (or substance of) any relevant oral statement made by defendant. (Id.).

In response, the Government asserts, as to the extent that Armstrong requests disclosure of any statements or records referencing any statements of Defendant, Defendant's statements have already been provided to Armstrong. (Gov't Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 4).

### 2. Documents and Tangible Objects

Pursuant to Rule 16(a)(1)(E), Defendant requests discovery of books, papers, documents, data, photographs, tangible objects, buildings, or places that are in the possession custody, or control of the Government which are (a) material to the preparation of the Defendant's defense; or (b) intended for use by the government as evidence in its case-in-chief at trial; or (c) were obtained from or belong to the defendant. (Armstrong's Mot. for Discovery [Docket No. 34]).

The Government, in its response, reiterated that it understands its ongoing obligations under Federal Rules of Criminal Procedure 12 and 16, and asserts that to the extent such discovery has not already been provided, the Government will give Armstrong such information. (Gov't Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 4).

### 3. Reports of Examinations and Tests

Pursuant to Rule 16(a)(1)(F), Defendant requests discovery of any results or reports of physical or mental examinations, or scientific tests or experiments material to the case which are

known to, or by the exercise of due diligence may become known to the government, including DNA, fingerprint, and ballistics analysis. (Armstrong's Mot. for Discovery [Docket No. 34]).

As for Defendant's request, the Government points out that the Minnesota BCA is currently analyzing the firearms seized in this case, and any results of the analysis will be disclosed upon receipt. (Gov't Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 4). As for the existence of any additional evidence or information pertaining to reports of examinations and tests, the Government contends that it is unaware of the existence of any such additional information, but should any be found, the Government agrees to provide disclosures pursuant to its ongoing obligations and the law. (Id.).

### 4. Expert Witnesses

Pursuant to Rule 16(a)(1)(G), Defendant requests discovery of a written summary of the expert testimony the Government intends to use at trial under Federal Rules of Evidence 702, 703, or 705, including a description of the witness options, the bases and the reason therefor, and the witnesses' qualifications. (Armstrong's Mot. for Discovery [Docket No. 34]).

The Government states that it is amenable to a reciprocal expert disclosure deadline set by the Court. (Gov't Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 4). The Court has already set such a deadline in its original Arraignment Order. [Docket No. 12]. The parties must disclose the identity of any expert witness they intend to call in their case-in-chief and make all expert disclosures related thereto as required by Federal Rule of Criminal Procedure 16 no later than twenty-eight (28) calendar days before trial. (Id.). In addition, the parties must disclose the identity of any expert who will testify in rebuttal of any disclosed case-in-chief expert witness and make all disclosures related to such rebuttal expert as required by Rule 16(a)(1)(G) no later than ten (10) calendar days before trial. (Id.).

### 5. Criminal record of Defendant

Finally, pursuant to Rule 16(a)(1)(D), Defendant requests the Government provide him with a copy of his criminal record if such a record exists. (Armstrong's Mot. for Discovery [Docket No. 34]). The Government states that a copy of Defendant's criminal history has already been provided. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 4).

### 6. Conclusion

Defendant Armstrong's Motion for Discovery, [Docket No. 34], is **GRANTED** in part and **DENIED** in part. Any supplemental disclosures by the Government under sections V.A.1-2, 5 shall be made as soon as practicable and in no event later than fourteen (14) calendar days before trial. The Government shall make disclosures under section V.A.3 according to the same disclosure schedule as in section V.A.4.

### B.  Sam's Motion for Discovery.

Defendant Sam makes multiple requests pursuant to Federal Rule of Criminal Procedure 16(a). (Sam's Mot. for Discovery and Inspection [Docket No. 48]). Specifically, Sam's requests encompass statements of the defendant, documents and tangible objects, reports of examinations and tests, expert witnesses, and his criminal record. (Id.).

### 1. Statements of the Defendant

Defendant requests pursuant to Federal Rule of Criminal Procedure 16(a) that the Court order the Government to provide Defendant with any written or recorded statements made by the defendant as well as any written record containing a reference to (or substance of) any relevant oral statement made by defendant. (Id.).

In response, the Government asserts, as to the extent that Sam requests disclosure of any statements or records referencing any statements of Defendant, Defendant's statements have

10

already been provided to Sam. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 15). In addition, the Government asserts that to the extent Sam requests statements other than his own in connection with the present matter, such statements have already been provided. (Id.).

### 2. Documents and Tangible Objects

Pursuant to Rule 16(a)(1)(E), Defendant requests discovery of books, papers, documents, data, photographs, tangible objects, buildings, or places that are in the possession custody, or control of the Government which are (a) material to the preparation of the Defendant's defense; or (b) intended for use by the government as evidence in its case-in-chief at trial; or (c) were obtained from or belong to the defendant. (Sam's Mot. for Discovery and Inspection [Docket No. 48]).

The Government, in its response, reiterated that it understands its ongoing obligations under Federal Rules of Criminal Procedure 12 and 16, and asserts that to the extent such discovery has not already been provided, the Government will give Sam such information. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 15).

### 3. Reports of examinations and tests

Pursuant to Rule 16(a)(1)(F), Defendant Sam requests discovery of any results or reports of physical or mental examinations, or scientific tests or experiments material to the case which are known to, or by the exercise of due diligence may become known to the government, and which are material to the preparation of the defense or are intended for use by the Government as evidence in chief at trial. (Sam's Mot. for Discovery and Inspection [Docket No. 48]).

As for Defendant Sam's request, the Government points out that the Minnesota BCA is currently analyzing the firearms seized in this case, and any results of the analysis will be disclosed upon receipt. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 15).

As for the existence of any additional evidence or information pertaining to reports of examinations and tests, the Government contends that it is unaware of the existence of any such additional information, but, should any be found, the Government agrees to provide disclosures pursuant to its ongoing disclosure obligations and the law. (Id.).

### 4. Expert Witnesses

Pursuant to Rule 16(a)(1)(G), Defendant requests discovery of a written summary of the testimony the Government intends to use at trial under Federal Rules of Evidence 702, 703, or 705, including a description of the witness options, the bases and the reason therefor, and the witnesses' qualifications. (Sam's Mot. for Discovery and Inspection [Docket No. 48]).

The Government states that it is amenable to a reciprocal expert disclosure deadline set by the Court. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 15). The Court has already set such a deadline in its original Arraignment Order. [Docket No. 12]. The parties must disclose the identity of any expert witness they intend in their case-in-chief and make all expert disclosures related thereto as required by Federal Rule of Criminal Procedure 16 no later than twenty-eight (28) calendar days before trial. (Id.). In addition, the parties must disclose the identity of any expert who will testify in rebuttal of any disclosed case-in-chief expert witness and make all disclosures related to such rebuttal expert as required by Rule 16(a)(1)(G) no later than ten (10) calendar days before trial. (Id.).

### 5. Criminal Record of Defendant

Finally, pursuant to Rule 16(a)(1)(D), Defendant requests the Government provide him with a copy of his criminal record if such a record exists. (Sam's Mot. for Discovery and Inspection [Docket No. 48]). The Government states that a copy of Defendant's criminal history has already

been provided. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 15).

### 6. Conclusion

Defendant Sam's Motion for Discovery and Inspection, [Docket No. 48], is **GRANTED** in part and **DENIED** in part for the same reasons as discussed supra in the Court's analysis of Defendant Sam's co-conspirator's motion for discovery. Any supplemental disclosures by the Government under sections V.B.1-2, 5 shall be made as soon as practicable and in no event later than fourteen (14) calendar days before trial. The Government shall make disclosures under section V.B.3 according to the same disclosure schedule as in section V.B.4.

## VI.    Defendant's Pretrial Motion to Disclose and Make Informants Available for Interview. [Docket No. 44].

Defendant Sam requests an Order from the Court compelling the Government to disclose the identity of any informant or informants utilized by the Government in its investigation, and to make such informants available for interview by Defendant's attorney.  (Def.'s Pretrial Mot. for Disclosure of the Identity of Informants [Docket No. 44]).

In its written response, the Government objects to any immediate disclosure.  (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 4).   However, the Government represents that given Sam and his co-defendant have been charged with conspiracy to make false statements during the purchase of firearms, the Government contends that informants who witnessed or participated in the offense are material and likely should be disclosed, even in the event the Government does not intend to call them at trial. (Id. at 6). But, the Government asserts that informants simply passing information should not be disclosed. (Id.). However, should any informants be identified as trial witnesses, and to the extent practicable, the Government offers

to disclose the informant's name or personal identifying information ten (10) days prior to trial. (Id.).

The Government relies on the "Informer's Privilege" in support of its argument that it is allowed "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. 53, 59 (1957) (citations omitted). However, there are several exceptions to the privilege. Id. Of those, the one most pertinent to the present case considers the "fundamental requirements of fairness" and a defendant's need to prepare an adequate defense. See Id. at 60-61 ("Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.").

"[T]here is no litmus test for determining when disclosure [of an informant's identity] is required[.]" United States v. Lapsley, 334 F.3d 762, 764 (8th Cir. 2003); see also Roviaro, 353 at 62 ("We believe that no fixed rule with respect to disclosure is justifiable."). However, the Eighth Circuit has indicated a court ruling on a motion for disclosure of an informant's identity "must weigh the defendant's right to information against the government's privilege to withhold the identity of its confidential informants." Lapsley, 334 F.3d at 763–64 (internal quotation marks and citations omitted).

Here, that balance is best served by requiring the Government to disclose to Defendant the identity of any informant whose testimony the Government intends to introduce at trial in the present case or whose identity is otherwise discoverable under Brady, Giglio, and their progeny, or the Government's other discovery obligations. However, the Government will not be required, at this time, to disclose the identity of any informant who may have been a mere tipster, who was

not directly involved in the charged offense, and whose testimony it does not intend to introduce at the trial in the present case, unless the informant's identity is otherwise discoverable.

To the extent Defendant seeks notice and disclosure of Government's intent to use or refer to and introduce into evidence at trial the statements or confessions of any co-defendant or unindicted co-conspirator, together with a designation of which statements or confessions the Government plans to so utilize, the motion is granted.

Therefore, Defendant Sam's Pretrial Motion to Disclose and Make Informants, [Docket No. 44], is **GRANTED** in part and **DENIED** in part. If the Government determines that it will use any confidential informants as witnesses at trial or seeks to use statements or confessions of any co-defendant or unindicted co-conspirator, the Government shall disclose the identity of those individuals to Defendant and make those informants available for a pretrial interview no later than fourteen (14) calendar days before trial or when the presiding trial judge requires disclosure of trial witnesses, whichever is earlier.[4]

## VII.    Defendant's Motion for Disclosure of Post-Conspiracy Statements of Co-Defendants. [Docket No. 45].

Defendant Sam seeks an Order compelling the Government to Disclose the post-conspiracy statements of all other co-defendants and unindicted co-conspirators. (Def.'s Pretrial Mot. for Disclosure of Post-Conspiracy Statements [Docket No. 45]). The request in this motion overlaps Defendant's request to make such individuals available for interview. (See Def.'s Pretrial Mot. for Disclosure of the Identity of Informants [Docket No. 44]). Specifically, Defendant requests the

---

[4] The Government's obligation with respect to confidential informants is generally satisfied when it provides a defendant with information pertaining to an informant's identity and location so that the defendant may contact the informant and request an interview or subpoena his or her testimony at trial. See United States v. Padilla, 869 F.2d 372, 376-77 (8th Cir. 1989). An informant always has the right, as all witnesses have, to decline to be interviewed and, to the extent the defendant requests such relief, the Government has no obligation to schedule meetings and/or "encourage" any informant to speak to defendant or his counsel. See United States v. Bittner, 728 F.2d 1038, 1041-42 (8th Cir. 1984) (finding no impermissible conduct by a government agent when he advised a witness of her right to decline interviews with defendant's attorney).

Court order the government to give notice and disclosure of any intent to use or refer to, and/or introduce into evidence at trial the statements or confessions of any co-defendant or unindicted co-conspirator, together with a designation of which statement or confessions the Government plans to so utilize. In addition, Defendant requests leave to file a motion for severance, suppression, and/or limine as indicated by the Government's response and a review of the materials by Defense counsel. (Def.'s Pretrial Mot. for Disclosure of Post-Conspiracy Statements [Docket No. 45]).

In its written response, the Government opposes Defendant's Motion to the extent Defendant seeks all post-conspiracy statements by co-Defendants or unindicted co-conspirators. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 45] at pp. 7-8). The Government, however, states that as a practical matter, it has already disclosed the defendants' responsive statements. In the event that other statements may exist, the Government offers to provide such material of its testifying witnesses ten (10) days before trial.

Federal Rules of Criminal Procedure 16 is the primary avenue available to a criminal defendant seeking discovery. United States v. Siewert, No. CRIM. 08-4 DWF/SRN, 2008 U.S. Dist. LEXIS 62184, 2008 WL 3165852, at *2 (D. Minn. June 10, 2008) (citing 3D Federal Practice and Procedure Rule 16 Summary, at 206 (2008 ed.)). Fed. R. Crim. P. 16(a)(1)(A)-(B) allows for discovery of a defendant's statements. Generally, a criminal defendant has no constitutional right to discovery from the Government beyond Rule 16. Siewert, 2008 U.S. Dist. LEXIS 62184, 2008 WL 3165852, at *2. However, as noted above, the Government has agreed to such disclosures here.

To the extent Defendant seeks notice and disclosure of Government's intent to use or refer to and introduce into evidence at trial the post-conspiracy statements or confessions of any co-defendant or unindicted co-conspirator, together with a designation of which statements or

confessions the Government plans to so utilize, the motion is granted. The Government shall provide such notice fourteen (14) calendar days before trial.

**VIII. Defendants' Motions for Early Disclosure of Jencks Act Material. [Docket Nos. 35, 42].**

Defendant Armstrong moves the Court for an Order requiring the Government to disclose Jencks Act materials at least ten (10) days before trial. (Armstrong's Mot. for Early Disclosure of Jencks Act Material [Docket No. 35]). Defendant Sam moves the Court for a similar Order requiring the Government to disclose Jencks Act materials at least thirty (30) days before trial. (Sam's Mot. for Early Disclosure of Jencks Act Material [Docket No. 42]).

As to both Defendants' motions, the Government objects to the motions arguing that it cannot be <u>required</u> to make pretrial disclosure of Jencks Act materials. (<u>Id.</u> at p. 2; Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 5).

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures. However, Defendant provides no citation to authority that would allow the Court to <u>require</u> early disclosure of Jencks Act material. Generally, the case law provides that the Court may <u>not</u> require the Government to make early disclosure of Jencks Act material. <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendants' Motions for Early Disclosure of Jencks Act Materials, [Docket Nos. 35, 42], are **DENIED**.[5]

## IX.    Defendants' Pretrial Motions for Government Agents to Retain Rough Notes and Evidence. [Docket Nos. 39, 49].

Both Defendants request an Order from the Court requiring any law enforcement agent, including any confidential informants, to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records. (Armstrong's Mot. for Gov. Agents to Retain Rough Notes [Docket No. 39]; Sam's Mot. for Gov. Agents to Retain Rough Notes and Evidence [Docket No. 49]).

The Government does not object to either Defendant's request for the <u>retention</u> of rough notes.  (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 8; Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 16).   Accordingly, Defendants' motions are **GRANTED** regarding rough notes as to <u>retention</u> only at this time.  If either Defendant seeks production or disclosure of rough notes, he will need to bring a separate motion for such production.

## X.    Defendant Sam's Pretrial Motion for Disclosure of Grand Jury Materials. [Docket No. 43].

Defendant Sam moves the Court to order the Government to disclose all testimony and corresponding exhibits present to the grand jury that issued the indictment in this case. (Sam's Mot. for Disclosure of Grand Jury Materials [Docket No. 43]). The Government opposes this motion. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 2).

---

[5] However, the Government <u>voluntarily</u> agreed to provide all Jencks Act material to the Defense by no later than ten (10) calendar days before trial. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 55] at p. 5; Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 1). The Court encourages such voluntary agreements.

"It has long been recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings. This principle is reflected in Rule 6(e) which establishes a general rule of confidentiality for all matters occurring before the grand jury." United States v. McDougal, 559 F.3d 837, 840 (8th Cir. 2009) (quotation and citation omitted). "Exceptions to the rule of nondisclosure will be made only where there is a 'particularized need.'" United States v. Haire, 103 F.3d 697, 699 (8th Cir. 1996); accord United States v. Broyles, 37 F.3d 1314, 1318 (8th Cir. 1994) ("It is well-established that a showing of 'particularized need' is necessary before the court will accede to such a release."). The burden is on the Defendant to make a showing of a "particularized need." Broyles, 37 F.3d at 1318.

Defendant Sam states that he needs the grand jury transcripts and corresponding exhibits to prepare for his defense. Defendant Sam, however, only generically references that such transcripts might help him "prepare to impeach, refresh the recollection of, and test the credibility of the prosecution's witnesses at trial, and to discover the substance of any oral, unrecorded statements of informants, alleged co-conspirators, and potential witnesses who could testify against Defendant at trial. (Sam's Mot. for Disclosure of Grand Jury Materials [Docket No. 43]).

The Court finds that such generic assertions do not give rise to a "particularized need." Defendant does not cite any authority that a mere general need or desire for materials to conduct a favorable cross-examination of the Government's trial witness amounts to a "particularized need." In United States v. Haire, 103 F.3d 697 (8th Cir. 1996), the only case cited by Defendant, the Eighth Circuit affirmed the District Court's decision that a defendant did not show a "particularized need" when the request was to discover "the substance of any oral, uncorded statements of informants and potential witnesses who could testify against him at trial."

19

Therefore, Defendant's request for disclosure of all grand jury materials is **DENIED** except to the extent the Government is in some way otherwise obligated to disclose such materials. See United States v. Daniels, 232 F. App'x 611, 612 (8th Cir. 2007) (per curiam) (no abuse of discretion in denying a motion for grand jury transcripts given defendant's "failure to make any showing in support of his request for them"). Indeed, as the Government highlights, Defendant's request seeks information that would typically be characterized as Jencks Act material. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 3). The Government has no obligation to provide prior statements of its witnesses until <u>after</u> the direct examination of a witness at trial. See e.g., United States v. Polk, 715 F.3d 238, 249 (8th Cir. 2013) ("A federal criminal defendant generally has no right to know about government witnesses prior to trial."); see also 18 U.S.C. § 3500(a); Fed R. Crim. P. 26.2.[6]

## XI.     Defendant Sam's Pretrial Motion to Sever. [Docket No. 47].

Defendant Sam moves the Court, pursuant to Federal Rule of Criminal Procedure 14, for severance of his trial from that of Defendant Armstrong, or, in the alternative, for severance of at least Count 10 alleged against Armstrong. (Sam's Motion to Sever [Docket No. 47]). Defendant Sam is charged with one count of conspiracy to make a false statement during the purchase of firearms, and eight counts of making false statements during the purchase of firearms. (Indictment [Docket No. 1]). Sam's co-defendant (Armstrong) is similarly charged in the conspiracy as well with an additional count of being a felon in possession of a firearm (Count 10). (Id.). The Indictment alleges that Sam and Armstrong conspired to illegally purchase firearms such that Sam would purchase the firearm and subsequently transfer the firearm to Armstrong who, at the time

---

[6] However, the Government <u>voluntarily</u> agreed to provide all Jencks Act material, including relevant transcripts and other statements of witnesses the Government intends to call during its case-in-chief, to the Defense before trial. The Government also has obligations under <u>Brady</u>, <u>Giglio</u>, and their progeny which may require disclosure of some grand jury materials.

of the transfer, was prohibited from possessing firearms. (Id.). Defendant Sam argues that he would be prejudiced if he is tried together with Armstrong because the jury will have difficulty distinguishing the alleged acts of Sam from those of his co-defendant. (Sam's Motion to Sever [Docket No. 47]).

The Government opposes Severance as it expects the witnesses against Sam and Armstrong to greatly overlap at trial. (Gov't's Omnibus Response to Defendant's Pretrial Mots. [Docket No. 59] at p. 9).

"When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." United States v. Darden, 70 F.3d 1507, 1526 (8th Cir. 1995). Federal Rule of Criminal Procedure 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

Federal Rule of Criminal Procedure 14(a), however, provides: "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

> There is a preference in the federal system for joint trials of defendants who are indicted together. This preference is especially compelling when the defendants are charged as coconspirators. It is well settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court . . . .

United States v. Benton, 890 F.3d 697, 713–14 (8th Cir. 2018) (internal quotations omitted).

Accordingly, if joinder is proper under Rule 8, a defendant seeking severance has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial. United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials. Zafiro v. United States, 506 U.S. 534, 540 (1993) (citations omitted).

A defendant seeking to sever his trial must therefore show that a joint trial would cause real prejudice. United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). "Real prejudice exists when (a) [a defendant's] defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." United States v. McConnell, No. 13-cr-273 (SRN/FLN), 2017 WL 111304, at *3 (D. Minn. Jan. 11, 2017) (internal quotations omitted). Further, regarding the severance of counts, the Eighth Circuit Court of Appeals has continually noted that "[j]udicial economy and legitimate public interests favor a joinder of all offenses against the accused." The decision of whether or not to sever defendants or counts is within the sound discretion of the Court. See United States v. Bohr, 581 F.2d 1294 (8th Cir. 1978).

In the present case, Defendant Sam first argues that severance of Count 10 is appropriate because he is not being charged with being a felon-in-possession and there is no allegation that the Defendants in the present case conspired to violate the pertinent felon-in-possession statute. (Sam's Motion to Sever [Docket No. 47]). However, under Rule 8, there need only "be some common activity involving all the defendants which embraces all the charged offenses, but it is not necessary that each defendant have participated in each act or transaction of the series." United States v. Andrade, 788 F.2d 521, 529 (8th Cir. 1986) (citing United States v. Wofford, 562 F.2d 582, 585 (8th Cir.1977)). Therefore, the fact that there is no allegation that Defendant Sam

22

conspired to violate the specific felon-in-possession statute does not inherently violate joinder under Rule 8. Nor does the Court find persuasive Sam's argument that "the jury will have insurmountable difficulty distinguishing the alleged acts of Sam from those of his co-defendant." (Sam's Motion to Sever [Docket No. 47]). Indeed, the district court is well-equipped to cure potential risk with "proper instructions and juries are presumed to follow [the Court's] instructions." Zafiro, 506 U.S. at, 540; see also United States v. Moore, 149 F.3d 773, 778 (8th Cir. 1998) (risk that jurors would not be able to compartmentalize evidence against various defendants was minimized by court's ongoing limiting instructions); United States v. Flores, 362 F.3d 1030 (8th Cir. 2004) (district court properly instructed jury and no evidence jury was unable to compartmentalize evidence against each defendant).

Still, even when joinder is proper under Rule 8, the Court may still order a severance under Rule 14 if "the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant[.]" Fed. R. Crim. P. 14(a). However, "[n]o prejudice results from the refusal to sever when evidence of one charge would [merely] be admissible in a separate trial on the other." United States v. Mink, 9 F.4th 590, 604 (8th Cir. 2021) (quotation and citation omitted). "Finally, there is a strong presumption against severing properly joined counts." Id. (quotation and citation omitted).

The Supreme Court recognizes that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro, 506 U.S. at 537. The Eighth Circuit has noted that "[s]everance is not required merely because codefendants present conflicting defenses." United States v. Watkins, 66 F.4th 1179, 1186 (8th Cir. 2023) (citing Zafiro, 506 U.S. at 538). Instead, the Eighth Circuit has instructed District Courts to only grant a severance if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. (quoting Zafiro,

506 U.S. at 538). In light of this preference, and at this juncture, where Defendant Sam can only invite the Court to speculate as to what evidence the Government might actually seek to introduce at a joint trial or how said evidence may not be suitably redacted, severance is not, at this time, appropriate. "Severance is a remedy that can be provided at the time of trial if [then] appropriate under the circumstances." U.S. v. Rios-Quintero, No. 16-cv-161(1) (MJD/LIB), 2016 WL 6134545, *13 (D. Minn. Sept. 9, 2016) (quoting U.S. v. Billups, 442 F. Supp. 2d 697, 706 (D. Minn. 2006)).  If circumstances change at the time of trial, Defendant Sam is free to seek redaction or renew his motion to sever before the trial judge at that time.  See Billups, 442 F. Supp. 2d at 706.

For the reasons articulated above, it is recommended that Defendant Sam's Pretrial Motion to Sever, [Docket No. 47], be **DENIED** without prejudice.

## XII.    Defendants' Motion to Dismiss Indictments. [Docket Nos. 36, 41].

Defendants Armstrong and Sam both move the Court pursuant to Federal Rule of Criminal Procedure 12, for an order dismissing all counts in the pending indictment against them. (Def. Armstrong's  Mot. to Dismiss Indictment [Docket No. 36]; Def. Sam's Mot. to Dismiss Indictment [Docket No. 41]).  Both Armstrong and Sam contend that 18 U.S.C. § 922(a)(6) is facially unconstitutional in light of New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022). Defendant Armstrong also contends that 18 U.S.C. § 922(g)(1) is unconstitutional both facially and as applied to him upon the Supreme Court's recent decision in Bruen.

### A.  Constitutionality of 18 U.S.C. § 922(g)(1)

A conviction under § 922(g)(1) requires the government to prove that (1) the defendant sustained a previous conviction for a crime punishable by a term of imprisonment exceeding one year, (2) he knowingly possessed a firearm, and (3) he knew that he belonged to a category of

24

persons prohibited from possessing a firearm, and (4) the firearm was in or affecting interstate commerce. See Rehaif v. United States, 139 S. Ct. 2191, 2200, 204 L. Ed. 2d 594 (2019); United States v. Coleman, 961 F.3d 1024, 1027 (8th Cir. 2020). The Court observes that under Eighth Circuit precedent such as in United States v. Jackson, 69 F.4th 495 (8th Cir. 2023), the constitutionality of § 922(g)(1) as applied to convicted felons has been upheld because the law "is consistent with the Nation's historical tradition of firearm regulation." Id. at 502 (quoting Bruen, 142 S. Ct. at 2130).

Accordingly, based on this controlling precedent, the Court recommends that Armstrong's Motion to Dismiss Indictment on the grounds that § 922(g)(1) is unconstitutional be **DENIED**.

### B.  Constitutionality of 18 U.S.C. § 922(a)(6)

Count one of the Indictment [Docket No. 1] charges Armstrong and his co-defendant Sam with conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 922(a)(6), which prohibits making false statements during a purchase of a firearm. The indictment alleges that Defendant Sam purchased multiple firearms from a Federal Firearm Licensee and, during the purchase, falsely certified on ATF Form 4473 that he was the actual buyer of the firearms ostensibly because all along he knew Defendant Armstrong was to be the intended recipient of the firearms Sam was purchasing. (Indictment [Docket No. 1]). Specifically, the Indictment focuses on Question 21a which asks:

> Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF  Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.**

ATF Form 4473.

The statute which Defendants Armstrong and Sam have been charged with prohibits the following:

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

18 U.S.C. § 922(a)(6). Both Defendants challenge § 922(a)(6) on the grounds that it violates the Second Amendment in light of the Supreme Court's Decision in Bruen. (Def. Armstrong's Mot. to Dismiss Indictment [Docket No. 36]; Def. Sam's Mot. to Dismiss Indictment [Docket No. 41]).

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Bruen did not concern a criminal statute. Rather, it involved a challenge to federal firearms licensing. Id. The decision included a discussion of Second Amendment caselaw and surprisingly announced a new two-prong test for evaluating the constitutionality of firearms regulation. Bruen, 597 U.S. at 17-18.  Under the first prong, the Court must determine whether the plain text of the Second Amendment covers the conduct at issue. Id. at 22-23, 30-33. If so, the second prong requires the Government to establish that the regulation is consistent with the historical tradition of firearms regulation in the United States. Id. at 22-23.

Defendants' argument here fails on Bruen's first prong. Defendant is charged with making a false statement during the acquisition of a firearm, in violation of § 922(a)(6). Section 922(a)(6) does not criminalize Defendant's possession of a firearm; it criminalizes making false statements. Contrary to Defendant's argument, the conduct at issue is not "acquiring a firearm," it is making a false statement on the ATF Form. The Second Amendment does not cover the conduct contemplated under § 922(a)(6).

26

Indeed, it is well-settled that an individual "who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." United States v. Knox, 396 U.S. 77, 79, 90 S. Ct. 363, 24 L. Ed. 2d 275 (1969). "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." Bryson v. United States, 396 U.S. 64, 72, 90 S. Ct. 355, 24 L. Ed. 2d 264 (1969). "[A] claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit." Dennis v. United States, 384 U.S. 855, 867, 86 S. Ct. 1840, 16 L. Ed. 2d 973 (1966) (stating that it was not a defense to a charge of lying about communist party membership on affidavits to claim that the statutory scheme sought to be evaded was defective). A defendant who lies "as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." Dennis, 384 U.S. at 867.

Therefore, because § 922(a)(6) does not regulate activity protected by the Second Amendment, § 922(a)(6) is constitutionally permissible. See generally, United States v. Reilly, CR-23-085-RAW, 2023 U.S. Dist. LEXIS 146106, 2023 WL 5352296, CR-23-085-RAW (E.D. Okla. Aug. 21, 2023) (finding that 18 U.S.C. § 922(a)(6) does not implicate conduct protected by the Second Amendment and, therefore, fails at Bruen's first prong).

Other courts have followed a similar analysis in rejecting constitutional challenges to statutorily required reporting obligations. For instance, in United States v. Ladd, No. 2:22-CR-057, 2023 U.S. Dist. LEXIS 107084, 2023 WL 4105414 (N.D. Ind. June 21, 2023), a defendant sought dismissal of an indictment that charged her with lying on various firearm purchase forms

in violation of § 922(a)(6). The defendant argued that § 922(a)(6) infringed upon her Second Amendment right to keep and bear arms by "conditioning her rights based upon providing information regarding indictment status and whether she is a user or addict of a controlled substance." Id. at *2 (internal quotation omitted). Rejecting this argument, the court found that the defendant could not "knowingly answer the question on the firearms dealer form falsely, and then after she [was] caught making a material misrepresentation, raise a constitutional challenge to the propriety of the very question." Id. (internal quotation omitted). The court continued, stating that "if [the defendant] wanted to challenge the constitutionality of the question being asked of her, she should have filed a civil suit invoking federal question jurisdiction." Id. In so holding, the Ladd court also noted that "[n]umerous precedents indicate that the prohibition on lying applies regardless of the statute or constitutional provision at issue." Id. at *6 (citing Kay v. United States, 303 U.S. 1, 6, 58 S. Ct. 468, 82 L. Ed. 607 (1938) (declining to review claim that Congress lacked constitutional authority to enact the Home Owners' Loan Act of 1933 raised by defendants who made false statements in violation of the act); United States v. Moore, 446 F.3d 671, 682 (7th Cir. 2006) (declining to decide if HUD regulation was unconstitutionally vague where defendant intentionally failed to disclose information).

Accordingly, the Court finds that § 922(a)(6) does not regulate any activity protected by the Second Amendment and it is recommended that both Defendants' Motions to Dismiss the Indictment, [Docket Nos. 36, 41], be **DENIED**.

## XIII.  Defendant Armstrong's Pretrial Motion to Suppress Search and Seizure. [Docket No. 38].

Defendant Armstrong moves the Court for an Order suppressing any evidence obtained from the execution of multiple investigative warrants.  (Def.'s Mot. [Docket No. 38]). There are

three search warrants at issue in this case—a residential search warrant, and two search warrants to search Armstrong's cell phone.

Armstrong has five central grievances pertaining to the residential search warrant (Gov't's Ex. 1). First, he alleges that the information that established probable cause in the residential search warrant was fatally stale. (Def.'s Memo. [Docket No. 68] at 5-11). Second, Armstrong alleges that the same warrant application failed to establish the supporting Confidential Informant's (CI's) reliability or basis of knowledge. (Id. at 11-15). Third, Defendant Armstrong asserts that the residential warrant application fails to establish a nexus between the allegations of criminal activity and his residence. (Id. at 15-20). Fourth, Defendant Armstrong avers that the residential warrant was overbroad. (Id. at 17). And finally, Armstrong argues that the good-faith exception under Leon should not apply due to what Armstrong perceives as the litany of alleged defects in the warrant. (Id. at 17-19); see United States v. Leon, 468 U.S. 897 (1984).

Finally, Defendant Armstrong also moves to suppress evidence recovered from the execution of search warrants for Armstrong's iPhone contents (Gov't's Exs. 2, 3). (See generally Id. at 19-25). Armstrong argues that the search warrants for the iPhone were overbroad, and that SA Dieter exceeded the scope of the initial search warrant (Gov't's Ex. 2) when he reviewed material outside the initially authorized date range. (Gov't's Ex. 2 at 19-24).

### A.  Statement of Facts[7]

The record presently before the Court indicates that, on June 14, 2023, law enforcement searched Defendant Armstrong's residence pursuant to a search warrant. (Gov't's Ex. 1). The information used to support this warrant was the product of an investigation that dated back almost

---

[7] The facts contained in this section are derived from the parties' exhibits and testimony presented in the motion practice for this case.

a year prior. (Tr. 21).[8] From late 2022 through 2023, Special Agent Michael Dieter (SA Dieter) had been investigating a separate individual, L.L. Daniels ("Daniels"), for trafficking controlled substances and firearms in Beltrami County. (Gov't's Ex 1 at p. 2). On March 31, 2023, a Minnesota State Trooper informed SA Dieter that Daniels was a passenger in a traffic stop in Morrison County. (Id.). During that traffic stop, police discovered a large quantity of marijuana and a firearm. (Id.).[9] In addition, three cell phones were found on Daniels. (Id.).[10] In SA Dieter's experience, the combination of multiple cell phones, drugs, and a firearm were together indicators of drug trafficking. (Id.).

Following up on this lead, SA Dieter obtained a state search warrant, and on April 5, 2023, he extracted and reviewed the data from Daniel's three cell phones. (Id.). During this search, SA Dieter found a text conversation between Daniels and a contact named "Don Armstrong." (Id. at p. 2-3).[11] In these text conversations, Don Armstrong sent several photographs of firearms to Daniels and indicated that he desired to sell three firearms to him. (Id.). Don Armstrong also indicated through his text messages that he desired to purchase several THC vape cartridges from Daniels and provided his home address (presumably to take delivery of the cartridges). (Id.). The

---

[8] Throughout this Report and Recommendation, the Court refers to the transcript of the January 9, 2024, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 67]).

[9] It was noted that the firearm recovered from the vehicle was a Glock semi-automatic pistol which had the slide cover plate removed. In SA Dieter's experience, such removal of the slide cover plate on Glock pistols is common when an individual installs a "switch" which is an aftermarket device roughly the size of a quarter that disengages the mechanical mechanism within a Glock semi-automatic pistol which limits the pistol to fire only one round of ammunition per trigger pull. By interfering with the normal function of the pistol, the aftermarket "switch" allows for multiple rounds to be fired with one trigger pull thereby converting the semi-automatic pistol into a fully automatic (machine) pistol. However, after conducting a search, the Officer who made the traffic stop was not able to locate a "switch." (Gov't.'s Ex 1 at p. 2).

[10] In SA Dieter's experience, drug traffickers often use multiple cellular devices in an attempt to evade detection by law enforcement. (Gov't.'s Ex 1 at p. 2).

[11] In addition to conversations with Don Armstrong, who would later be determined by SA Dieter to be the Defendant in this present case, SA Dieter also found multiple conversations concerning contraband including one such conversation regarding a source of supply in Mexico, as well as, multiple local customers within the area.

address "Don Armstrong" provided to Daniels was the Silver Springs Lane address, which DMV records connected with Defendant Armstrong. (Id.).

On the morning of May 31, 2023, SA Dieter walked the area around the Silver Springs Lane address where he observed individuals entering work trucks preparing to leave for a job site. (Id.). In addition, SA Dieter observed a trailer with a small excavator on it. (Id.). SA Dieter noted that this was the same piece of equipment that he observed on Defendant Armstrong's publicly available Facebook page. (Id.).

With this information, SA Dieter continued his investigation, and, later in the day on May 31, 2023, SA Dieter and another Minnesota Bureau of Criminal Apprehension ("BCA") agent interviewed a confidential informant ("CI") for additional information regarding Armstrong. The CI told the agents that (s)he "knew [Armstrong] to possess firearms" and that (s)he was "aware that Armstrong sells cocaine." (Id.). The CI went on to independently provide the agents with Armstrong's address and descriptions of vehicles owned by Armstrong. (Id.). In addition, the CI also informed the agents that (s)he had seen Armstrong with "pistols and long guns in the past" and "believed [him to] travel[] in his vehicle with a pistol on a regular basis." (Id.). SA Dieter found the CI's information reliable since (s)he "ha[d] provided information to law enforcement in the past that ha[d] lead to the seizure of controlled substances and the arrest of suspects in controlled substance trafficking investigations. (Id. at 3-4). From a prior investigation into Defendant Armstrong, SA Dieter was aware that Armstrong was prohibited from possessing a firearm at any time because he is a convicted felon. (Id.; see Tr. 21).[12]

---

[12] SA Dieter stated that he knew that Armstrong had prior convictions for "check forgery, theft, fleeing police in a motor vehicle, false name, 3rd degree drugs, carry [sic] pistol without a permit and was also adjudicated delinquent as a minor for dangerous weapons/drive by shooting."

SA Dieter then conducted an additional investigation into Armstrong's cell phone toll records which indicated that he regularly communicated with a known drug trafficker which, in conjunction with the other evidence outlined in the application, further bolstered SA Dieter's belief that Armstrong's residence, vehicles, and person contained evidence of a crime. As a result, on June 12, 2023, SA Dieter applied for, and Cass Country District Court Judge Jana Austad authorized a search warrant. (Id. at p. 6-8). On June 14, 2023, the search warrant was executed on Defendant Armstrong's residence and the accompanying vehicles. (Gov't's Ex. 3 at p. 2).

On June 14, 2023, Police conducted a traffic stop of Defendant Armstrong's vehicle. (See generally Gov't's Ex. 4 Video 1 at 0:02:05).[13] Police detained Armstrong where he made several admissions after being told law enforcement had a search warrant for his house and vehicles. (Gov't's Ex 4 Video 1 at 0:05:45-0:06:00). Subsequently, the police returned him to his residence whereupon SA Dieter personally informed Armstrong that he had a "search warrant for the house" and all of Armstrong's vehicles. (Gov't's Ex. 4 Video 1 at 0:17:40; Gov't's Ex. 4 Video 2 at 0:00:45-0:01:15). SA Dieter then advised Armstrong of his rights through a Miranda warning and further explained that the search warrant was for narcotics and firearms. (Gov't's Ex. 4 Video 2 at 0:01:15-0:02:00). After being told that the police were about to search his residence, Defendant Armstrong admitted he was in possession of guns for his own safety and had a small quantity of drugs in his safe. (Gov't's Ex. 4 Video 2 at 0:02:05-0:03:30). Armstrong then agreed to explain to the officers where the contraband was located in his house, and he told SA Dieter the code to his safe. (Gov't's Ex. 4 Video 2 at 0:02:50-0:03:17).

---

[13] Government's Exhibit 4 contains two MP4 video files consisting of boy camera footage. The first MP4 file is titled "00_0054527413_96_1f_14_18-0054505480_0054524927_0054524932_video0" and is approximately twenty (20) minutes in length. This first MP4 file will be referred to as "Video 1." The second MP4 file is titled "BWC_DIETER_ARMSTRONG_interview" and is approximately fifteen (15) minutes in length. This second MP4 file will be referred to as "Video 2."

Inside the residence, law enforcement located 14 firearms, 22.5 grams of heroin, 15.3 grams of cocaine, numerous rounds of ammunition, and various firearm accessories. (Gov't Ex. 2 at p. 2). In addition, the uniformed Cass Country Deputy, who initially conducted the traffic stop and detained Amstrong prior to his subsequent arrest, took custody of Armstrong's mobile phone: an Apple iPhone with a blue case. (Id.).

On June 21, 2023, SA Dieter applied for a warrant to search the data from February 1, 2023, through June 14, 2023, on Amstrong's iPhone. (See generally Id.).[14] The application for the warrant for Armstrong's iPhone contained the relevant background of the investigation up to that point. (Id. at 2; Tr. 22). In addition, SA Dieter noted in his affidavit that, from his experience, individuals involved in the trafficking of controlled substances tend to utilize cellular devices along with social media applications to communicate with those whom they are selling to and also with their sources of supply. (Id. at 3). SA Dieter's application further discussed how he would use the program "Cellebrite" to extract the data from the phone and that this extraction software cannot exclude content by date. (Id. at 2). Because of this, SA Dieter informed the issuing judge in his affidavit that if he inadvertently observed content outside of the date range that appeared to be evidence of criminal activity, he would apply for an additional warrant. (Id.). On June 22, 2023, the State District Court Judge signed the search warrant, and SA Dieter subsequently conducted an extraction of the data on Armstrong's iPhone. (Id. at 4; Gov't Ex. 3 at p. 2).

On July 17, 2023, SA Dieter reviewed content extracted from Defendant Armstrong's iPhone. (Gov't Ex. 3 at p. 2). SA Dieter performed a keyword search on the extracted data and

---

[14] Specifically, the warrant requested to search the "call logs, text messages including SMS, MMS, and text messages/communications through third-party applications, instant messages from social media applications, instant messages from social medial applications including but not limited to Facebook Messenger, user accounts located in the phone/console, location data, photos, and videos from February 1st 2023 through June 14th 2023." (Gov't.'s Ex. 2 at p. 1).

33

noticed a conversation that he believed indicated that Armstrong was engaged in narcotics trafficking. (Id.). However, this conversation was noted to be outside of the date range specified by the June 22, 2023, search warrant.[15] SA Dieter then copied the text of this conversation and used it in a subsequent expanded search warrant application. (See Id.; Tr. 41). In addition, SA Dieter read and typed into his report verbatim several other lengthy text conversations that were outside the initially authorized date range. (Tr. 41-42).

SA Dieter did not stop his search at this point, but instead, he continued to look through all the extracted data. SA Dieter observed another conversation between Defendant Sam and Defendant Armstrong which occurred on October 26, 2022. (Id.). SA Dieter summarized the contents of this conversation which indicated that Defendant Sam and Defendant Armstrong were to meet that day in a sporting goods shop in Walker, Minnesota. (Id.). SA Dieter concluded that this conversation was to coordinate a strawman sale of firearms from Sam to Armstrong since the two firearms that were purchased by Sam in Walker were recovered from Armstrong's residence during the June 14, 2023, search. (Id. at 2-3).

Based on all these additional conversations outside the temporal scope of the initial warrant, SA Dieter requested a second search warrant be issued that expanded the temporal scope of the prior warrant to a new date range of July 5, 2021, to July 14, 2023. (Id. at 3). The state district court judge signed the second warrant on July 18, 2023. (Id.)

**B.  Standard of Review**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

---

[15] This conversation was noted in SA Dieter's subsequent warrant to have occurred on July 5, 2021. (Gov't.'s Ex. 3 at p. 2).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

### C.  Analysis of Staleness of Residential Search Warrant

Defendant Armstrong argues the residential search warrant (Gov't Ex. 1) was not supported by probable cause due to a lapse of time between the observations of the evidence and the issuance of the warrant. (Def.'s Memo. [Docket No. 68] at 6). As such, Defendant Armstrong argues that this lapse of time makes any probable cause fatally stale. (Id. (citing United States v. Formaro, 152 F.3d 768, 771 (8th Cir. 1998))).

"It is axiomatic that probable cause must exist at the time of the search and not merely at some time earlier." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005) (collecting cases). Even information obtained from reliable, confidential informants must be sufficiently close in time to the issuance of the warrant and subsequent search so that probable cause can be said to exist at the time of the search itself. See, e.g., United States v. Wash., No. 21-cr-126 (ADM/ECW), 2022 U.S. Dist. LEXIS 32981, 2022 WL 538878, at *13 (D. Minn. Feb. 23, 2022), report and recommendation adopted, 2022 U.S. Dist. LEXIS 93561, 2022 WL 1658175 (D. Minn. May 25, 2022); United States v. Abari, No. 19-cr-103 (MJD/ECW), 2019 U.S. Dist. LEXIS 234017, 2019

WL 10886798, at *3 n.3 (D. Minn. Oct. 1, 2019), report and recommendation adopted, 2020 U.S. Dist. LEXIS 146273, 2020 WL 4727436 (D. Minn. Aug. 14, 2020). Thus, a lapse in time, between the observations provided in an affidavit in support of a search warrant and the issuance and execution of said search warrant, may possibly render probable cause fatally stale. Id.

"While a lapse of time between the observations of a witness and the issuance of a search warrant may render probable cause fatally stale, '[t]here is no bright-line test for determining when information is stale.'" United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007) (alteration in Gettel) (quoting United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995)). "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." United States v. Ortiz-Cervantes, 868 F.3d 695, 700 (8th Cir. 2017) (cleaned up); see United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007).

"The passage of time is not," however, "necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered." Gettel, 474 F.3d at 1086 (internal citations and quotations omitted). A Court may not "simply count[ ] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but it must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995) (quoting Koelling, 992 F.2d at 822). Moreover, "where recent information corroborates otherwise stale information, probable cause may be found." United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995) (quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990)). Additionally, where an affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information

36

and the search becomes less critical in assessing probable cause." <u>United States v. Rugh</u>, 968 F.2d 750, 754 (8th Cir. 1992); <u>see</u> <u>United States v. Smith</u>, 21 F.4th 510, 515 (8th Cir. 2021).

Depending on the nature of the criminal activity and the kind of property subject to search, the Eighth Circuit has observed the expiration date for information is highly variable. In some instances, such as "easily concealed, readily consumable, and highly incriminating narcotics," information can quickly go stale in the absence of additional evidence "indicating an ongoing and continuing narcotics operation." <u>United States v. Kennedy</u>, 427 F.3d 1136, 1142 (8th Cir. 2005). On the other hand, for illegal activity that is typically ongoing in nature, even older information may supply probable cause for a warrant. For instance, in <u>Maxim</u>, information that was four months old, or even three years old, may supply probable cause for a warrant to search the home of a person suspected of illegal possession of a firearm, due to the continuing nature of the possession offense and the tendency for survivalists and other firearm enthusiasts to keep their weapons for a long period of time. <u>Maxim</u>, 55 F.3d at 397.

In the present case, the Court finds that the information attested to in SA Dieter's affidavit in support of the June 12, 2023, Search Warrant was not impermissibly stale at the time when the Search Warrant was issued or executed. Defendant Armstrong argues that the Search Warrant in question was stale due to an alleged ephemeral nature of drugs. (Def.'s Memo. [Docket No. 68] at 8 (citing <u>Kennedy</u>, 427 F.3d at 1141-42 (holding that "information of an unknown and undetermined vintage relaying the location of mobile, easily concealed, readily consumable, and highly incriminating narcotics could quickly go stale in the absence of information indicating an ongoing and continuing narcotics operation"))). However, SA Dieter's application makes it clear that the investigation was in regard to controlled substances <u>and</u> firearms. (<u>See</u> Gov't's Ex. 1 at p. 1-2). As such, the Court need not consider whether the drug offense was stale at the time of

execution provided there was probable cause for the firearm offense. While Defendant Armstrong correctly highlights that SA Dieter's affidavit does not provide a date certain of when Armstrong possessed a firearm, the affidavit contains evidence that Armstrong's possession of firearms was ongoing. (Gov't Ex. 1 at p. 2).

Assuming arguendo that the illegal possession of firearms for the purposes of selling said weapons is the type of illicit activity that could quickly become stale in a fashion similar to that contemplated by the Eighth Circuit in <u>Kennedy</u> with narcotics, the affidavit provides evidence that suggests Armstrong was in continuous and ongoing possession of a firearm for personal use. For instance, SA Dieter met with a CI who had knowledge of Armstrong's criminal activities. (Gov't Ex. 1 at p. 2).[16] Notably, the CI advised that Defendant Armstrong possessed firearms. (<u>Id</u>.). Expounding on this topic, the CI reported that (s)he "had seen Armstrong with both pistols and long guns in the past and believed [him to] travel[] in his vehicle with a pistol on a <u>regular</u> basis." (<u>Id</u>. (emphasis added)).[17] This suggests that Armstrong's possession of firearms was ongoing at the time of the warrant. <u>See</u> <u>United States v. Jones</u>, 801 F.2d 304, 314 (8th Cir. 1986) ("[T]he passage of time between the transactions on which a warrant is based and the ensuing search is less significant when the facts recited indicate activity of a continuous nature."). The Eighth Circuit has noted that "individuals who possess firearms tend to keep them for long periods of time" and because of this, "[i]nformation that someone is suspected of possessing firearms illegally is not stale, even several months" after the information is obtained. <u>United States v. Neal</u>, 28 F.3d 1069,

---

[16] For reasons discussed infra, the Court finds that the CI referenced in SA Dieter's June 12, 2023, warrant was reliable.

[17] Defendant Armstrong asserts that because SA Dieter used the past tense when penning his affidavit, such language is indicative of the staleness of the CI's information. However, as <u>Kennedy</u> points out, "the ultimate determination [of staleness] does not turn solely upon whether the verbs used by the hearsay informant end in 's' or 'ed'. Rather the question of whether information of an indeterminant recency establishes probable cause that contraband or evidence of a crime will be found in a particular location at a particular time depends on the circumstances of the case, including the crime under investigation and the property sought." <u>Kennedy</u>, 427 F.3d at 1142 (internal quotation removed); <u>see</u> <u>United States v. Gibson</u>, 123 F.3d 1121, 1124 (8th Cir. 1997).

1074 (8th Cir. 2008); see also Maxim, 55 F.3d at 397 (noting that some firearm purchasers tend to retain their weapons for a long period of time which minimizes the weight which a lapse of time between information and the affidavit and the execution of the search warrant carries).[18]

Accordingly, the Court finds that the evidence regarding Defendant Armstrong's possession of firearms supplied in SA Dieter's affidavit in his warrant application was not stale.

### D.  The Reliability of the CI

Defendant Armstrong argues that SA Dieter's affidavit fails to establish the CI's reliability or basis of knowledge. (Def.'s Memo. [Docket No. 68] at 11).

Armstrong first asserts that because SA Dieter did not use the specific phrase "confidential reliable informant" and instead uses the language "confidential informant," the issuing judge could not assume that the CI had been determined to be reliable without additional information. Defendant Armstrong is correct that SA Dieter's affidavit does not use the precise term "confidential reliable informant." However, the use of such specific language is not dispositive to the issue because Courts consider the totality of the circumstances to determine the weight, if any, an informant tip deserves. See Illinois v. Gates, 462 U.S. 213, 238 (1983).

"The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998). Here, SA Dieter's affidavit did in fact inform the issuing judge that the

---

[18] The Court is aware that in Maxim, the Eighth Circuit focused its analysis on individuals whose relationship with firearms was rooted in a survivalist/paramilitary nature. Maxim, 55 F.3d at 397. SA Dieter's affidavit alludes to Defendant Armstrong's relationship with firearms to stem from a mix of a desire to sell weapons (as indicated by prior messages attempting to sell firearms to Daniels) to simply generally possessing "a pistol" when traveling on "a regular basis." (Gov't.'s Ex.  1 at p. 3). In the Court's review, the presence of a singular pistol suggests that Armstrong's pistol was for personal use and was not inventory which he carried with him for a future sale. As such, the Court declines to decide whether evidence an individual possessed firearms for the purpose of a future sale more closely aligns with Maxim or Kennedy. Instead, the Court takes the narrower view that there was evidence in the affidavit to support the finding that Armstrong possessed a firearm for personal use. As such, this evidence would align closely with Maxim and would not become stale on the timeframes contemplated in SA Dieter's warrant.

"CI had provided information to law enforcement in the past that ha[d] led to the seizure of controlled substances and the arrest of suspects in controlled substance trafficking investigations." (Gov't's Ex. 1 at p. 3-4).

In addition, reliability can be established through independent corroboration. For example, "[i]f information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993) (citing Gates, 462 U.S. at 233-34). To support a finding of probable cause, "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause." United Sates v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (quoting United Sates v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)).

In the present case, SA Dieter's affidavit informed the issuing judge that the CI was "cooperating with law enforcement for monetary compensation and ha[d] provided information that ha[d] been independently corroborated by law enforcement." (Gov't's Ex. 1 at p. 3-4). For example, SA Dieter highlighted that the CI was able to independently corroborate the veracity and credibility of his information by providing details regarding the location of Armstrong's residence and descriptions of Armstrong's vehicles. (Id. at p. 3-4). These descriptions matched SA Dieter's personal, first-hand, observations of both. (Id.).

Accordingly, SA Dieter's affidavit, while not using the specific word "reliable," does establish that the CI had a history of providing reliable information in prior investigations. SA Dieter also established that the CI's information concerning Armstrong was reliable through the corroboration of factual details provided by the CI concerning Armstrong. As such, the Court finds that the CI's testimony was reliable to establish probable cause.

### E.  Nexus between Allegations in the Affidavit and Armstrong's Residence

Defendant Armstrong argues that the residential Search Warrant fails to properly provide a nexus between the claims that Armstrong sells contraband and possesses firearms with the search of his home. (Def.'s Memo. [Docket No. 68] at 15).

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000). "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." United States v. Etheridge, 165 F.3d 655, 657 (8th Cir. 1999).

As discussed supra, SA Dieter's affidavit establishes probable cause that Defendant Armstrong illegally and continuously possessed at least one firearm for personal use. Other courts have noted that "people generally keep [firearms] at home or on their persons." United States v. Cowling, 648 F.3d 690, 696 (8th Cir. 2011) (internal quotations omitted). As such, "when the government has shown probable cause that a defendant illegally possessed a firearm, that showing naturally extends to his residence." United States v. Huntington, No. 20-cr-145 (ECT/BRT), 2021 WL 165112, at *2 (D. Minn. Jan. 19, 2021) (citing Cowling, 648 F.3d at 696); see also United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1998) ("It was reasonable for the magistrate to believe that the defendant's gun and . . . silencer would be found in his residence . . . even though the affidavit contained no fact that the weapons were located in the defendant's trailer. . . .").

To support his argument that there was an insufficient nexus of the criminal allegations and Armstrong's home, Defendant cites to United States v. Rios-Uscanga, Crim. No. 16-316 (RHK/KMM), 2017 U.S. Dist. LEXIS 68991, 2017 WL 1534746 (D. Minn. Mar. 13, 2017), report and recommendation adopted by Doc. No. 59, 2017 U.S. Dist. LEXIS 68009, 2017 WL 1534745

(D. Minn. Apr. 26, 2017). However, <u>Rios-Uscanga</u> is distinguishable from the present facts. In <u>Rios-Uscanga</u>, the court suppressed evidence from a search warrant where the affidavit lacked enough detail to connect the defendant to the alleged illegal activity. Namely, there was "no assertion or even suggestion in the affidavit that the residence to be searched [was] Mr. Rios-Uscanga's home." <u>Rios-Uscanga</u>, 2017 U.S. Dist. LEXIS 68991, 2017 WL 1534746, at *3. Moreover, the affidavit "did not state that Mr. Rios-Uscanga even stayed occasionally at the home, but only that it is 'listed' to his girlfriend. While the affidavit said Mr. Rios-Uscanga was seen entering and exiting, it did not allege that this observation occurred more than once." <u>Id.</u>

In the present case, however, SA Dieter and the CI both independently established Armstrong lived at the address to be searched as opposed to some third party's address as in <u>Rios-Uscanga</u>. Indeed, SA Dieter knew Armstrong lived at the address to be searched through records supplied by the Department of Vehicle Services, (Gov't's Ex. 1 at p. 3), and this information corroborated the CI's independently provided information regarding the location of Armstrong's residence. (Gov't's Ex. 1 at p. 3). In addition, SA Dieter observed a small excavator at the address which was identical to the excavator which was observed on Defendant Armstrong's personal Facebook page. (<u>Id.</u>) Furthermore, the CI provided descriptions of Armstrong's vehicles which matched those observed parked at the address to be searched. (<u>Id.</u>).

SA Dieter's affidavit supports a nexus between firearms which the CI reported Armstrong carried "on a regular basis" and the aforementioned residence because gun owners typically keep their personal firearms at home or on their person. <u>See</u> <u>Cowling</u>, 648 F.3d at 696.

**F.  The Breath of the Search Warrant**

Defendant Armstrong argues that the Search Warrant application was overly broad by authorizing the search of Armstrong's home, detached garage, and "[a]ll vehicles located at the

property." (Def.'s Memo. [Docket No. 68] at 15). Specifically, Armstrong argues that the Search Warrant should have delineated between other private vehicles which happened to be on the property and those which belonged to Armstrong. (Id.).

Armstrong does not provide any case law or authority to support his argument, but rather suggests that SA Dieter and law enforcement should have somehow first obtained the registration numbers of all of the vehicles in order to determine to whom they belonged. (Id.). The Eighth Circuit has favorably reviewed search warrants authoring searches of residence as well as "all persons and any and all vehicles found on said property or persons at the time the warrant is served" in the context of searching for contraband or illegal firearms. United States v. Romo-Corrales, 592 F.3d 915, 917 (8th Cir. 2010); United States v. Dankemeyer, No. 22-2850, 2023 U.S. App. LEXIS 22152, 2023 WL 5423521 at *2 (8th Cir. Aug. 23, 2023).

Accordingly, the Court does not find the scope of the search warrant to be overbroad considering the subject matter of the warrant and the fact that the CI mentioned that Armstrong regularly travels in a vehicle with his firearm. (Gov't's Ex. 1 at p. 3). Given this context, SA Dieter's affidavit is sufficiently particular to satisfy the Fourth Amendment.

### G.  Good Faith Exception under Leon

Assuming for the sake of argument only that the warrant was not valid, the Court finds that SA Dieter and other law enforcement on the scene relied on the warrant in good faith when it was executed. Even if evidence is obtained as a result of the execution of a warrant that is not supported by probable cause, "there is an exception for evidence obtained by an officer who relied in objective good faith on a search warrant." United States v. Koons, 300 F.3d 985, 990-91 (8th Cir. 2002). In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court held that a warrant issued

by a judge "normally suffices to establish that a law enforcement officer has acted in good faith in conducting [a] search." Leon, 468 U.S. 922 (internal citations and quotations omitted).

The Eighth Circuit has outlined four situations where an officer's reliance on a warrant would be unreasonable and where the good faith exception would not apply: (1) where "the officer included information in the affidavit he knew was false or would have known was false except for his reckless disregard for the truth"; (2) where "the affidavit is so lacking in probable cause that it is objectively unreasonable for the officer to rely on it"; (3) where "the judge failed to act in a neutral or detached manner"; or (4) when "the warrant is so facially deficient that the officer cannot reasonably presume the warrant to be valid." United States v. Phillips, 88 F.3d 582, 586 (8th Cir. 1996) (citing Leon, 468 U.S. at 922). Defendant Armstrong argues that the second and fourth situations apply in his case.

First, Armstrong asserts that there is no basis to believe the allegations in the affidavit are not stale. As discussed supra, the Court disagrees. Second, he argues that there is no basis to believe there would be criminal activity connected to Armstrong's home. For the reasons stated above, due to the nature of keeping personal firearms on one's person or in one's home, as well as SA Dieter's knowledge that Armstrong could not lawfully possess a firearm because of his criminal record, there is a reasonable basis on the face of the warrant application on which the executing officers could have reasonably believed that Armstrong's home would be implicated. Third, Armstrong argues there is no basis to believe that every vehicle on his property, regardless to whom it belonged, may have contained contraband. As discussed prior, such warrants are routinely

upheld and therefore would not invoke the unreasonableness exception even if vehicles not belonging to Armstrong happened to be on the property.[19]

Accordingly, the Court finds that the good faith exception <u>would</u> apply even had the search warrant at issue been otherwise invalid.

### H. The Scope and Breadth of the <u>First</u> Cell Phone (iPhone) Warrant

Defendant Armstrong argues that: (1) the June 22, 2023, Search warrant for his cell phone was not sufficiently particular, and (2) SA Dieter exceeded the scope of the warrant when he viewed messages outside of the authorized date range. (Def.'s Memo. [Docket No. 68] at 19).

### 1. The Particularity of the Warrant and Good Faith Exception

The Government concedes that the June 22, 2023, search warrant was not sufficiently particular and was overbroad in that SA Dieter requested "the courts permission to extract data from Armstrong's cellular device to obtain further evidence of controlled substance trafficking and illegal possession/sales of firearms." (Gov't's Ex. 2 at p. 1; Gov't's Memo. [Docket No. 74] at p. 27). However, the Government argues that this warrant is entitled to the good faith exception under <u>Leon</u>.

The Fourth Amendment requires that search warrants state with particularity the things to be seized thus making "general searches . . . impossible and prevent[ing] the seizure of one thing under a warrant describing another." <u>Marron v. United States</u>, 275 U.S. 192, 196 (1927). However, "[n]ot every Fourth Amendment violation results in exclusion of the evidence obtained pursuant to a defective search warrant." <u>United States v. Hamilton</u>, 591 F.3d 1017, 1027 (8th Cir. 2010). This is because the purpose of the exclusionary rule is to "safeguard Fourth Amendment rights

---

[19] In any event, the warrant at issue was clearly applicable to Armstrong's vehicles at his residence, and if other vehicles were searched that did not belong to him, any constitutional violation would be against the privacy interests of individuals other than Armstrong, and he has not demonstrated any standing to complain thereof.

generally through its deterrent effect." Herring v. United States, 555 U.S. 135, 139-40 (2009) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. Id. at 144. "But when the police act with an objectively 'reasonable good-faith belief' . . . or when their conduct involves only simple 'isolated' negligence" that their conduct is lawful." Davis v. United States, 564 U.S. 229, 238 (2011) (quoting Leon, 468 U.S. at 909; Herring, 555 U.S. at 237).

As applied here, if a warrant lacks particularity, evidence seized during a search relying on said warrant may be entitled to the good faith exception. United States v. Szczerba, 897 F.3d 929, 936 (8th Cir. 2018). However, if a warrant is so "obviously deficient that any reasonable officer would have known that it was constitutionally fatal" then such behavior by law enforcement would fall under the "reckless" or "grossly negligent" categories which would not be entitled to the benefit of the good faith exception. Id. at 938-39; Davis, 564 U.S. at 238. The central question is whether the "application of the exclusionary rule in this case would . . . result in appreciable deterrence of police misconduct." Szczerba, 897 F.3d at 938-39.

As discussed supra, the Eighth Circuit has outlined four situations where an officer's reliance on a warrant would be unreasonable and where the good faith exception would not apply: (1) where "the officer included information in the affidavit he knew was false or would have known was false except for his reckless disregard for the truth"; (2) where "the affidavit is so lacking in probable cause that it is objectively unreasonable for the officer to rely on it"; (3) where "the judge failed to act in a neutral or detached manner"; or (4) when "the warrant is so facially deficient that the officer cannot reasonably presume the warrant to be valid." Phillips, 88 F.3d at 586 (citing Leon, 468 U.S. at 922).

46

Here defendant relies on the fourth exception arguing that SA Dieter should have known that the issued warrant authorizing him to review "call logs, text messages . . ., instant messages from social media applications . . ., location data, photos, and videos" all without regard to the content or subject matter of that material would be impermissible under the Fourth Amendment. (Def.'s Memo. [Docket No. 68] at 19-20).  While the Defendant, Government, and the Court, ultimately agree that the issued warrant was overbroad, the question is whether the warrant was so deficient that SA Dieter would not be entitled to the good faith exception under <u>Leon</u>.

The Eighth Circuit Court of Appeals has extended the <u>Leon</u> good faith exception to search warrants that are insufficiently particular or are overbroad. <u>See, e.g.</u>, <u>Jackson</u>, 2019 U.S. Dist. LEXIS 241388, 2019 WL 13127190, at *12; <u>United States v. Harris</u>, No. 20-cr-98 (SRN/TNL), 2021 U.S. Dist. LEXIS 166945, 2021 WL 3929270, *4 (D. Minn. Sept. 2, 2021) (assuming without deciding that the Facebook search warrant was overly broad, concluding that the good-faith exception applied, and citing cases); <u>United States v. Henderson</u>, 416 F.3d 686, 695 (8th Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant); <u>United States v. Curry</u>, 911 F.2d 72, 78 (8th Cir. 1990).

 Relevant factors for the Court to consider when evaluating whether <u>Leon</u> applies include, among other things, whether the warrant was issued by an unbiased judge, whether the officer who requested the warrant was the same officer who executed the warrant, whether there was probable cause for the search, whether the sworn application was attached to the warrant, and whether, in the context of the warrant, the officer had a reasonable belief the warrant was limited to the seizure of more particular items. <u>See, e.g.</u>, <u>Henderson</u>, 416 F.3d at 695; <u>Curry</u>, 911 F.2d at 78; <u>United States v. Bryant</u>, No. 19-CR-29 (ADM/ECW), 2019 U.S. Dist. LEXIS 122588, 2019 WL 3307393,

at *8 (D. Minn. June 7, 2019), <u>report and recommendation adopted</u>, No. CR 19-29 ADM/ECW, 2019 U.S. Dist. LEXIS 122125, 2019 WL 3308220 (D. Minn. July 23, 2019).

Defendant Armstrong argues that because SA Dieter had been a police officer for 17 years and "routinely" used search warrants in his investigations, he could not have reasonably believed the overbroad warrant supplied probable cause. (<u>See</u> Tr. 19-20, 21).[20] However, when comparing the present case to the relevant factors which the Eighth Circuit has promulgated, this Court finds that SA Dieter is entitled to a good faith exception insofar as the constitutional defects in the <u>first</u> iPhone Search Warrant were not so facially obvious that relying on the warrant would result in conduct commensurate with 'gross negligence.' In making this determination, the Court considers the fact that SA Dieter both applied for and executed the warrant. In addition, there was probable cause for the search due to the evidence found in the prior residential search which this Court has determined did not infringe the Fourth Amendment. SA Dieter's cell phone warrant application was accompanied by his sworn affidavit setting forth why he thought probable cause existed. Finally, based on the totality of the warrant and SA Dieter's testimony, the Court's impression of the circumstances is that SA Dieter had the belief that the warrant was issued for him to specifically search for evidence relating to the selling of drugs and the illegal possession of firearms.

Accordingly, the Court finds that the good faith exception under <u>Leon</u> applies insofar as the first cell phone search warrant was impermissibly broad. As such, the issuance of first search warrant itself is not fatal under the Fourth Amendment.

### 2. The Execution of the Warrant

As for the execution of the first cell phone search warrant, Defendant Armstrong asserts that SA Dieter's failure to properly filter the cell phone extraction by the relevant, limited

---

[20] This argument is found in a prior section of Defendant Armstrong's Memo regarding the residential search warrant; however, the Court assumes that this argument was also meant to apply to the cell phone search warrants as well.

timeframe of February 1, 2023 through June 14, 2023 amounts to conduct that would warrant exclusion. (Def.'s Memo. [Docket No. 68] at 20; Gov't's Ex 2 at p. 1).  Armstrong points out that when SA Dieter came across incriminating messages that were outside of the date range set forth in both the warrant application and the warrant thus outside the scope of the warrant, SA Dieter did not stop his search, but instead he read through the entire download of messages to completion. (Def.'s Memo. [Docket No. 68] at 21). This additional reading is apparent because SA Dieter used these conversations outside of the temporal scope of the first warrant to request an additional search warrant which expanded the search dates out to June 14, 2023, and back to July 5, 2021, the date of the oldest incriminating text message he had recovered. (Id.). Defendant asserts that SA Dieter's purpose for applying for the additional expanded warrant was not to allow a broader search, but instead, it was to belatedly authorize the unconstitutional search he had already completed. (Id.).

The Contents of Defendant Armstrong's cell phone were downloaded using a tool known as GrayKey in a process known as extraction. (Tr. 34). The results were viewed using a program known as Cellebrite. (Tr. 41).  Armstrong asserts that Cellebrite has the ability to filter searches by date.[21] SA Dieter, while being aware of other methods to filter data, testified that he was not aware of Cellebrite's ability to filter searches by date or to arrange data chronologically. (Tr. 35). In addition, SA Dieter did not take precautions to avoid inadvertently obtaining material outside the date range by looking at the date before reading the message. (Tr. 38).

Despite being clearly outside of the temporal scope of the first cell phone search warrant, the Government argues that the conversations that were found by SA Dieter and used in his second

---

[21] Cellebrite has had the ability to filter searches by date since at least 2019. See Filter reports based on date range to focus your investigative efforts, Cellebrite, (Jan. 9, 2019), https://cellebrite.com/en/productupdates/release-version-7-13-ufed-physical-analyzer-ufed-logical-analyzer-cellebrite-reader/ ("Recognizing that time is of the essence, we created a report filtering option that allows you to focus on data within a specific timeframe.").

search warrant application for the cell phone fall under the doctrine of plain view. Neither party cites any controlling authority that would direct this Court on how the plain view would (or would not) apply to the present circumstances. Indeed, it appears that the Eighth Circuit has never explicitly adopted or rejected the plain view doctrine with respect to digital searches. In addition, circuits appear to be split as to whether the plain view doctrine even applies to digital searches. See, e.g., United States v. Mann, 592 F.3d 779, 784-85 (7th Cir. 2010) (applying plain view doctrine to a digital search); United States v. Williams, 592 F.3d 511, 521-22 (4th Cir. 2010) (holding in the alternative that plain view doctrine would apply to the challenged search); but see United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1170-71 (9th Cir. 2010) (declining to apply plain view doctrine to a digital search); United States v. Carey, 172 F.3d 1268, 1272-74 (10th Cir. 1999) (same).

District courts in the Eight Circuit have explored the application of the plain view doctrine as applied to digital searches. See United States v. Eggerson, Case No. 18-cr-110-DWF-KMM, 2018 WL 6520648 (D. Minn. Sept. 27, 2018), report and recommendation adopted, 2018 WL 5962481 (D. Minn. Nov. 14, 2018), aff'd, 999 F.3d 1121 (8th Cir. 2021). However, despite the Government's assertion, this present case is distinguishable from Eggerson. In Eggerson, the investigator exceeded the scope of the authorized search by finding videos of a firearm when the original cell phone search warrant was authorized to search the phone for evidence of drug dealing. Id. at *13-14. First, as a practical matter, the Court notes the situation in Eggerson is distinguishable because, unlike a date range, there are no ways to "filter" content on a cell phone for the particular activity that is being searched for. However, the primary reason Eggerson is not applicable here is because unlike some videos and images, the criminality of a text messages, such as the ones SA Dieter found by reading messages outside the temporal scope of his warrant, are

not immediately apparent. In addition, unlike in <u>Eggerson</u>, SA Dieter did not have the lawful right of access to messages since the digital place where he found the messages was outside the temporal scope of the warrant under which he was acting.

Indeed, the Eighth Circuit has established the plain view exception (at least as applied in non-digital circumstances) applies when: "if "(1) the officer <u>lawfully arrived at the location from which he or she views the object</u>, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." <u>United States v. Saddler</u>, 19 F.4th 1035, 1041-42 (8th Cir. 2021) (quoting <u>United States v. Arredondo</u>, 996 F.3d 903, 907 (8th Cir. 2021)) (emphasis added).

SA Dieter testified that the phone extraction is an "all-or-nothing" proposition in that, one cannot specify the dates of which material is to be extracted. (Tr. 34). Although the Cellebrite software certainly did have the capacity to limit cell phone data downloads to a date range, SA Dieter claims he did not have a choice as to the data that he would be able to view because he subjectively did not know how to sort the data chronologically or filter for dates. Importantly here, however, SA Dieter did not even bother to check the date of any message before reading through its entirety.

A digital search is similar to a physical search in that law enforcement might not know what they will find before executing a warrant. However, just because law enforcement can access evidence outside of the scope of a warrant does not give law enforcement carte blanche authority to conduct a general search. Indeed, Officers may look in only those places likely to hold the items particularly described in the warrant. Police cannot open a spice box when searching for a rifle. <u>See, e.g.</u>, <u>Horton v. California</u>, 496 U.S. 128, 141 (1990). Nor can they rummage through a medicine cabinet to look for a flat-screen television. <u>See, e.g.</u>, <u>United States v. Galpin</u>, 720 F.3d

436, 447 (2d Cir. 2013). By the same logic, SA Dieter was not authorized to rummage through every file on the phone without any safeguards in place to ensure that SA Dieter did not inadvertently observe material outside the temporal scope of the first cell phone search warrant. Even a simple action such as checking a date <u>before</u> reading would likely have made a difference in the present case.

However, by choosing to remain ignorant of Cellebrite's date sorting methods, and by adopting a personal search strategy that involved finding evidence first and only checking the dates of the messages after, SA Dieter effectively converted his first, temporally limited search warrant into a general warrant. Extending the plain view doctrine to the present case would effectively make any <u>temporal restriction</u> on such a data search warrant as in this case meaningless.

The plain view doctrine would not apply here because the "incriminating character" of the messages that SA Dieter copied verbatim to support his second warrant would not be "immediately apparent." <u>Arredondo</u>, 996 F.3d 907. As discussed above, the incriminating character of finding a video of a gun while searching for video evidence of drug activity such as in <u>Eggerson</u>, would be immediately apparent and would not require any effort by the observing officer to instantly suspect a crime. However, the Eighth Circuit has held that when an officer needs to perform additional investigative steps to form probable cause, the incriminating character of the evidence is no longer immediately apparent. <u>Id.</u> For example, in <u>Arredondo</u>, a law enforcement officer who was called to respond to a domestic disturbance noticed small glass containers that appeared to be similar to containers that hold common household items such as essential oils, and medications on a couch. <u>Id.</u> The officer picked up the vials to read the labels because he had no idea of the contents. <u>Id.</u> At that moment the vials had been seized and searched before the officer had any probable cause to believe there were any illegally possessed controlled substances inside. <u>Id.</u>; see <u>Arizona v. Hicks</u>,

480 U.S. 321, 323-26 (1987) (moving components of two stereos in order to read the stereos' serial numbers was a search and the plain view of the stereos without serial numbers did not supply probable cause to believe they were contraband, even though the expensive stereos "seemed out of place in the squalid and otherwise ill-appointed" apartment).

The cell phone content and messages outside of the first warrant's limited date range that SA Nielson discussed verbatim in his second warrant application consist of multiple texts and their incriminating nature would not readily have been apparent unless SA Nielson first read through the majority of the message. Taking the time to read a message that is several sentences long, while ignoring whether the date of the message puts it within or outside of the temporal scope of the search warrant's authority in the first place, is the additional "investigative step" which makes the incriminating nature of these messages not immediately apparent. As such, the plain view doctrine does <u>not</u> apply.

Accordingly, the Court finds that SA Dieter impermissibly exceeded the scope of the first cell phone search warrant.

### 3. Good-Faith exception under <u>Leon</u>.

Defendant Armstrong points out that SA Dieter "blatantly violated the terms of the search warrant" by searching Armstrong's phone without regards to the date restriction in the first search warrant, and then sought a second warrant based on text messages which he knew were reviewed outside the temporal scope of the first warrant. (Def.'s Memo. [Docket No. 68] at 23). The Government asserts that it should be entitled to the good-faith exception because SA Dieter proffered his intended procedure to the court in his application for the first phone search warrant. (Gov't's Ex. 2; Gov't's Memo. [Docket No. 74] at p. 32).

"Under the <u>Leon</u> good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." <u>United States v. Hudspeth</u>, 525 F.3d 667, 676 (8th Cir. 2008) (internal quotation marks omitted). As a threshold matter, <u>Leon</u> applies "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." <u>Leon</u>, 468 U.S. at 920 (1984) (emphasis added).

Despite <u>Leon's</u> language that the good faith exception applies only when officers act within the scope of a warrant, courts have nonetheless applied the good faith exception when the searching officers made an "honest mistake" in exceeding the scope of the warrant, <u>see</u> <u>United States v. Houck</u>, 888 F.3d 957, 960-61 (8th Cir. 2018) (quoting <u>Maryland v. Garrison</u>, 480 U.S. 79, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987)); or acted in objective good faith in conducting the search, <u>United States v. Biles</u>, 100 F. App'x 484, 493-94 (6th Cir. 2004); <u>United States v. Gorman</u>, 104 F.3d 272, 275 (9th Cir. 1996). The "honest mistake" language in <u>Houck</u> originated in <u>Maryland v. Garrison</u>, 480 U.S. 79 (1987), which was decided after <u>Leon</u>. In <u>Garrison</u>, the Supreme Court considered whether a police search went beyond the authorized scope of the search. <u>Garrison</u>, 480 U.S. at 86. The Court focused on the reasonableness of the officer's conduct and reiterated "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." <u>Id.</u> at 87-88. "The Fourth Amendment allows for some 'honest mistakes' that are made by officers in the process of executing search warrants." <u>United States v. Suellentrop</u>, 953 F.3d 1047, 1050 (8th Cir. 2020) (quoting Garrison, 480 U.S. at 87)).

The Eighth Circuit has recently concluded that "[t]he <u>Leon</u> good-faith exception to the exclusionary rule, therefore, allows the admission of evidence obtained by officers who reasonably believed that the warrant authorized the search, even if their interpretation was mistaken." <u>United States v. Shrum</u>, 59 F.4th 968, 974 (8th Cir. 2023). Accordingly, "when assessing whether an officer relied in good faith on a warrant, [the Court must] consider the totality of the circumstances, including what the officer knew but did not include in an affidavit." <u>Id.</u> (internal brackets and quotations omitted).

As discussed supra, both reading and copying messages plainly outside of the authorized date range permitted by the first warrant exceeded the scope of the first warrant. It would be unreasonable to conclude that SA Dieter did not, or could not, realize the dates of the same conversations fell outside the first warrant's temporally authorized scope until after he read them fully. Indeed, SA Dieter stated in his first warrant application that he would apply for subsequent warrants if he "inadvertently observes content outside of the date range that appears to be evidence of criminal activity;" thus, SA Dieter foreshadowed his own unconstitutional search methodology which does not support the notion that SA Dieter made an honest mistake.

Here, SA Dieter's testimony indicates that he began reviewing the phone records intermittently over several days. (Tr. 36-37). Once SA Dieter started seeing data outside the date range of the first warrant, he decided that he would apply for a second warrant. (Tr. 27-28). SA Dieter claimed in his testimony did not know how to filter or search data belonging to a particular date range, nor was the information presented chronologically. (Tr. 30-31, 35). However, it appears to the Court that SA Dieter's search strategy consisted of searching through multiple files outside the scope of the first warrant precisely for the purpose of finding material to support his application for the second warrant. (<u>Id.</u>). Given this search strategy, it is not surprising that SA

Dieter saw messages outside of the first warrant's temporal scope. In fact, the only information that SA Dieter provided in his second cell phone search warrant affidavit (Gov't's Ex. 3) which differed from his first application (Gov't's Ex. 2) were the verbatim recitations of the "conversations outside the February 1st 2023 to June 14th 2023 date range." (Gov't' Ex. 3 at p. 2).

The Court recognizes "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." Garrison, 480 U.S. at 87-88. However, the Court does not find SA Dieter's testimony that he viewed these messages dated outside the temporal scope of the first warrant by mistake to be credible. Perhaps if SA Dieter had only inadvertently viewed a single message, the Court would be more compelled to follow SA Dieter's accounting of his search procedures. However, there are multiple messages outside the temporal scope of the first warrant that had to be reviewed in their entirety before they could be used in the subsequent search warrant. As such, the Court can only conclude SA Dieter deliberately chose to check the dates of messages only after reading the full content of the conversations.

The purpose of the exclusionary rule is to "safeguard Fourth Amendment rights generally through its deterrent effect." Herring v. United States, 555 U.S. 135, 139-40 (2009) (emphasis added). Because it is hard to curb honest mistakes made by officers through exclusion, the exclusionary rule applies to behavior that is "deliberate," "reckless," or "grossly negligent" with respect to the Fourth Amendment. Id. In essence, the exclusionary rule is a doctrine created to compel respect for constitutional rights. Law enforcement cannot unilaterally decide to what degree they will abide by the Fourth Amendment by choosing to remain uninformed, untrained, or generally incompetent when conducting a search.  Indeed, the good-faith exception is not an open invitation for law enforcement to openly ignore constitutional rights when it is convenient.

Viewing a single conversation outside of the date range might be a mistake, viewing several is a pattern. Foreshadowing the mistake and then using it to one's benefit when convenient is the foundation of a plan. SA Dieter's conduct when executing the first cell phone search warrant could properly be characterized with words such as "grossly negligent," "reckless," and even potentially "deliberate" considering the circumstances.

Accordingly, the Court declines to apply the good-faith exception under <u>Leon</u> in these circumstances and concurs with Defendant that the application of the exclusionary rule would be proper to cure the Fourth Amendment violation and to deter such improper conduct by law enforcement in the future. Therefore, to the extent to which Defendant's Motion to Suppress Evidence, [Docket No. 38], seeks an Order of this Court suppressing all evidence flowing from the second July 18, 2023, Cell Phone Search Warrant (Gov't Ex. 3), the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 38], be **GRANTED** in part and **DENIED** in part as set forth above.[22]

## XIV. Defendant Armstrong's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 37].

Defendant Armstrong moves to suppress all statements, admissions, and answers made during his interrogation by law enforcement officers on June 14, 2023. Defendant Armstrong made two separate statements to law enforcement officers that are pertinent. The first statement occurred during the traffic stop before the execution of the search warrant obtained for Armstrong's residence. (<u>See, e.g.</u>, Gov't Ex. 4 Video 1 at 0:05:45-0:06:00). The Government concedes that Armstrong was not advised of his rights prior to law enforcement asking him questions which elicited incriminating responses. (Gov't Omnibus Response to Defendant's Pretrial Mots.

---

[22] Content of Defendant Armstrong's cell phone dated within the temporal range of the first cell phone search warrant was constitutionally discovered. Content outside the temporal range of the first cell phone search warrant shall be suppressed.

[Docket No. 55] at p. 6).[23] However, the Government also states that they do not intend to use Defendant Armstrong's first incriminating statement in their case-in-chief. (Id.). Rather, the Government intends to possibly use the statement only as impeachment evidence should Amstrong testify in his defense or otherwise elicit his hearsay statements. (Id.).

Armstrong's second statement occurred after he was transported from the location of the traffic stop to his residence. (Gov't Ex. 4 Video 2 at 0:02:05-0:03:30). Prior to Defendant's incriminating statement, Armstrong was given a <u>Miranda</u> warning. (Gov't Ex. 4 Video 2 at 0:01:15-0:02:00). After being told that the police were about to search his residence, Defendant Armstrong then admitted he was in possession of guns for his own safety and that he had a small quantity of drugs in his safe. (Gov't Ex. 4 Video 2 at 0:02:05-0:03:30; Gov't Ex. 4 Video 1 at 0:05:45-0:06:00).

## A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). Accordingly, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom

---

[23] It is unclear from Defendant's Amstrong briefing as to which statement made before being <u>Mirandized</u> Armstrong seeks to suppress. The Government's response, [Docket No. 55], alludes to the possibility that the court does not have a copy of the recording of the Defendant's Statement made prior to being read his rights. However, it appears that Gov't.'s Ex. 4 Video 1 contains several relevant statements made by Defendant Armstrong. But, without any indication of what Armstrong's statement was, the Court is unable to know if the videos in Gov't.'s Ex. 4 contain the relevant statement and therefore cannot determine if the statement was custodial. Armstrong's memorandum is devoid of any reference to a statement made prior to SA Dieter Mirandizing Armstrong. Instead, Defendant's brief argues that any of Armstrong's June 14, 2023, custodial statements should be suppressed due to a defect in the residential search warrant. (Def.'s Memo. [Docket No. 74] at p. 26). However, for the reasons stated above, the Court finds this argument unpersuasive.

of action in any significant way[.]" <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005) (internal quotations omitted).

A defendant is entitled to a <u>Miranda</u> warning prior to custodial interrogation. <u>Miranda</u>, 384 U.S. at 444-45. "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005) (quoting <u>Rhode Island v. Innis</u>, 466 U.S. 291, 300-01 (1980)). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. <u>United States v. Richardson</u>, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444.

**B. Analysis**

Starting with the second statement made at Defendant Armstrong's residence, the Parties agree that Armstrong had been advised of his rights under <u>Miranda</u> by SA Dieter. (Gov't's Ex. 4 Video 2 at 0:01:15-0:02:00). It was only after that advisory that Defendant Armstrong admitted he was in possession of guns for his own safety and that he had a small quantity of drugs in his safe. (Gov't's Ex. 4 Video 2 at 0:02:05-0:03:30). Instead, Defendant Armstrong challenges the admission on the grounds that Armstrong made these statements in response to being advised that

the police had a search warrant for his property, and therefore his admissions were the fruit of the illegal search warrant. For all of the reasons discussed supra, the search warrant for Armstrong's residence (Gov't Ex. 1) was valid. Therefore, Armstrong's admissions could <u>not</u> be the poisonous fruit of an illegal search.

As for the first statement made before police took Armstrong to his residence, these statements were made after police had detained Defendant Armstrong with handcuffs and had placed him in the back of the police vehicle. (<u>See</u> Gov't Ex. 4 Video 1 at 0:05:45-0:06:00). Throughout the entirety of Video 1 found in Gov't Ex. 4, Defendant Armstrong is never advised of his rights under <u>Miranda</u>. (<u>See</u> <u>generally</u> <u>Id.</u>).[24]

By stating that they do not intend to use Defendant Armstrong's first incriminating statement in their case-in-chief, but possibly use the statement only as impeachment evidence should Amstrong testify in his defense or otherwise elicit his hearsay statements, the Government has effectively mooted the Defendant's Motion to Suppress as to his first incriminating statement. (Gov't Omnibus Response [Docket No. 55] at p. 6). Although a defendant's statement that is suppressed as a result of <u>Miranda</u> violations is unavailable to the state during its case-in-chief, such a statement may be admissible as a prior inconsistent statement and used for impeachment purposes provided it was made voluntarily. <u>See</u> <u>Harris v. New York</u>, 401 U.S. 222, 224-26, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). Because Defendant Armstrong has not raised the issue of whether his first incriminating statement was made voluntarily or involuntarily, he has waived that

---

[24] However, because Video 1 starts only midway through law enforcement's interaction with Defendant Armstrong after the traffic stop was well underway, the Court cannot say for certain whether Defendant Armstrong was, or was not, advised of his <u>Miranda</u> rights before the beginning of Video 1. However, since there seems to be no argument by the Government to the contrary, the Court can only conclude that Defendant Armstrong was <u>not</u> advised of his rights at any time during this initial interaction.

8.  Defendant Sam's Motion for Disclosure of Jencks Act Material, [Docket No. 42], is **DENIED**, as set forth above;

9.  Defendant Sam's Motion for Disclosure of Grand Jury Material, [Docket No. 43], is **DENIED**, as set forth above;

10. Defendant Sam's Motion for Disclosure of the Identity of Informants, [Docket No. 44], is **GRANTED** in part and **DENIED** in part, as set forth above;

11. Defendant Sam's Motion for Disclosure of the Post-Conspiracy Statements of Co-Defendants or Unindicted Co-Conspirators, [Docket No. 45], is **GRANTED** in part and **DENIED** in part, as set forth above;

12. Defendant Sam's Motion for Disclosure of 404(b) Evidence, [Docket No. 46], is **GRANTED**, as set forth above;

13. Defendant Sam's Motion for Discovery and Inspection, [Docket No. 48], is **GRANTED** in part and **DENIED** in part, as set forth above; and

14. Defendant Sam's Motion to Preserve Rough Notes, [Docket No. 49], is **GRANTED**, as set forth above.

Further, **IT IS HEREBY RECOMMENDED THAT**:

1.  Defendant Armstrong's Motion to Dismiss Indictment, [Docket No. 36], be **DENIED**;

2.  Defendant Armstrong's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 37], be **DENIED**;

3.  Defendant Armstrong's Motion to Suppress Evidence Obtained by Search and Seizure, [Docket No. 38], be **GRANTED** in part and **DENIED** in part as set forth above; and

4.  Defendant Sam's Motion to Dismiss Indictment, [Docket No. 41], be **DENIED**; and

15. Defendant Sam's Motion to Sever, [Docket No. 47], be **DENIED**.

Dated: March 12, 2024                          s/Leo I. Brisbois
                                               Hon. Leo I. Brisbois
                                               U.S. MAGISTRATE JUDGE


**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.